Bradford **COLEMAN**, individually, and on behalf of other members of the general public similarly situated, and as an aggrieved employee pursuant to the Private Attorneys General Act ("PAGA"), Plaintiff,

v.

**ESTES EXPRESS LINES, INC.**, a Virginia Corporation, Estes West, a business entity form unknown, G.I. Trucking Company, and Does 2 through 10, inclusive, Defendants.

Case No.: CV 10–2242 ABC (AJWx).

United States District Court, C.D. California.

July 19, 2010.

Mark P. Estrella, Miriam L. Schimmel, Robert E. Byrnes, Sue Jin Kim, Initiative Legal Group APC, Payam Shahian, Strategic Legal Practices APC, Los Angeles, CA, for Plaintiff.

David L. Terry, David L. Woodard, Poyner Spruill LLP, Charlotte, NC, Sarah N. Drechsler, Timothy M. Freudenberger, Carlton Disante & Freudenberger LLP, Irvine, CA, for Defendants.

## ORDER RE: PLAINTIFFS' MOTION FOR ORDER REMANDING MATTER TO STATE COURT

AUDREY B. COLLINS, District Judge.

Pending before the Court is Plaintiff Bradford Coleman's Motion for Order Remanding Matter to State Court, filed on April 23, 2010. Defendants Estes Express Lines, Inc. ("Estes Express"), and Estes West d/b/a G.I. Trucking Co. (collectively "Defendants"), opposed on May 24, 2010,

and Plaintiff replied on June 1, 2010. The Court ordered the parties to submit supplemental briefs, which they filed on July 2, 2010, and July 12, 2010. The Court heard oral arguments on July 19, 2010. After considering the case file, extensive briefing, and arguments in this matter, the Court GRANTS Plaintiff's motion and REMANDS this case to Los Angeles Superior Court where it was originally filed.

## BACKGROUND [1]

Plaintiff was employed by Estes Express and Estes West (dba G.I. Trucking) as a "Pickup & Delivery Driver" (or "P & D" Driver) from approximately October 2004 through September 10, 2009. (First Amended Compl. ("FAC") ¶ 22.) Plaintiff filed his First Amended Complaint in Los Angeles Superior Court on February 25, 2010, styled as a class action. Plaintiff's two proposed classes are an "unpaid wage" subclass comprised of "[a]ll non-exempt or hourly paid employees who worked for Defendants in California within four years prior to the filing" of the complaint, and a "non-compliant wage statement" subclass comprised of "[a]ll non-exempt or hourly paid employees of Defendants who worked in California and received a wage statement within one year prior to the filing" of the complaint. (FAC ¶ 17.)

In his original complaint, Plaintiff had named only Estes Express as a defendant, but on March 10, 2010, he filed a notice with the Superior Court that he was replacing one of his Doe Defendants in the First Amended Complaint with Estes West. In the amended complaint, Plaintiff alleged that both Estes Express and Estes West violated myriad California wage and hour statutes, including: California Labor Code sections 510 and 1198 (unpaid overtime); Labor Code sections 226.7 and 512(a) (unpaid meal period premiums); Labor Code section 226.7 (unpaid rest break premiums); Labor Code sections 201 and 202 (untimely payment of wages upon termination); Labor Code section 204 (untimely payment of wages during employment); Labor Code § 226(a) (non-compliant wage statements); California Business and Professions Code section 17200; and the Private Attorneys General Act (California Labor Code sections 2698 et seq.). Specifically, Plaintiff alleged:

• First claim: "Plaintiff and class members consistently worked in excess of eight (8) hours in a day, in excess of twelve (12) hours in a day, and/or in excess of forty (40) hours in a week" and, that during this period, "Defendants willfully failed to pay all overtime wages owed to Plaintiff and class members." (FAC ¶¶ 43–44.) The remedies requested are "unpaid overtime compensation, as well as interest, costs and attorneys' fees" and civil penalties of $100 for each employee per pay period for the first violation and $200 for each employee per pay

---

1. Because the Court's subject matter jurisdiction is at issue, the Court may consider the relevant facts from Plaintiff's First Amended Complaint ("FAC"), as well as the extrinsic evidence submitted by the parties. *See McLachlan v. Bell,* 261 F.3d 908, 909 (9th Cir. 2001).

Both parties objected to certain evidence. As to Plaintiff's objections, to the extent the Court relies on Gerczak's declarations in this opinion, Plaintiff's objections to that evidence are OVERRULED. As to Defendants' objec-

tions, Plaintiff's application submitted to the California Department of Motor Vehicles is a judicially noticeable public record, so Defendants' objection to it is OVERRULED. *See United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003) ("Courts may only take judicial notice of adjudicative facts that are 'not subject to reasonable dispute.' "). However, Defendants' objection to Plaintiff's request for judicial notice of his paystub is well-taken and the Court has not considered it in reaching the conclusions herein.

period for each violation thereafter. (*Id.* ¶¶ 46–47.)

● Second claim: "Defendants willfully required Plaintiff and class members to work during meal periods and failed to compensate Plaintiff and class members for work performed during meal periods." (*Id.* ¶ 57.) The remedies requested are "one additional hour of pay at the employees' hourly rate of compensation for each work day that the meal period was not provided," civil penalties, costs and attorney's fees. (*Id.* ¶¶ 60–61.)

● Third claim: "Defendants willfully required Plaintiff and class members to work during rest periods and failed to compensate [them] for work performed during rest periods." (*Id.* ¶ 67.) The remedies sought are "one additional hour of pay at the employee's regular hourly rate of compensation for each work day that the rest period was not provided," civil penalties, and costs and attorney's fees. (*Id.* 70–71.)

● Fourth claim: "Defendants willfully failed to pay Plaintiff and class members who are no longer employed by Defendants their wages, earned and unpaid, either at the time of discharge, or within seventy-two (72) hours of their leaving Defendant's employ." (*Id.* ¶ 74.) The remedies sought are "the statutory penalty wages for each day they were not paid, up to a thirty (30) day maximum," civil penalties, and costs and attorney's fees. (*Id.* ¶¶ 76–78.)

● Fifth claim: "Defendants willfully failed to pay Plaintiff and class members all wages due to them, within any time period permissible by California Labor Code section 204." (*Id.* ¶ 83.) The remedies sought are those "available for violations of California Labor Code section 204," civil penalties, and

costs and attorney's fees. (*Id.* ¶¶ 84–85.)

● Sixth claim: "Defendants have intentionally and willfully failed to provide employees with complete and accurate wage statements." (*Id.* ¶ 88.) The remedies sought are "the greater of ... actual damages caused by Defendants' failure to comply ... or an aggregate penalty not exceeding four thousand dollars per employee," injunctive relief to ensure compliance with wage reporting laws, civil penalties, and costs and attorney's fees. (*Id.* ¶¶ 91–93.)

● Seventh claim: Defendants' alleged acts violated California Business & Professions Code sections 17200. (*Id.* ¶ 97.) The remedy sought is "restitution of the wages withheld and retained by Defendants during a period that commences four years prior to the filing of [the] complaint." (*Id.* ¶ 99.)

The complaint does not limit the number of violations and provides only that the time frame to assess violations is the four-year period for the unpaid wages sub-class and one-year period for the non-compliant wage statements sub-class provided in the class definitions. Nor did Plaintiff limit the amount of damages he is seeking for the class, other than to allege that "[t]he amount in controversy for each class representative, including claims for compensatory damages and pro rata share of attorney's fees, is less than $75,000." (*Id.* ¶ 1.)

According to Defendants, Estes Express acquired G.I. Trucking in 2005. (2d Gerczak Decl. ¶ 3.) Before that time, G.I. Trucking was registered as a corporation with the state of California. (Plaintiff's 1st Request for Judicial Notice, Ex. A.). After the acquisition, G.I. Trucking became Estes West, dba G.I. Trucking, and it assumed the identity of a "wholly-owned subsidiary" of Estes Express, although it operated as an "internal regional division" of

Estes Express, just like the other regional divisions of the Southeast, Southwest, Northeast, and Upper Midwest. (Opp'n 17.)

Since the acquisition, Estes Express has owned 100% of Estes West. (2d Gerczak Decl. ¶ 3.) As Estes Express's Director of Human Resources explains, Estes Express exercises significant control over the employment-related policies and practices of Estes West. For example, Estes Express directs "every aspect of the payroll function in California, including establishing pay periods, pay days and pay rates for all employees in California and elsewhere in the Estes West region." (*Id.*) Estes Express decides whether Estes West employees are exempt or non-exempt, based on job functions determined by Estes Express. (*Id.*) Estes Express also sets policies and determines and controls the procedures for Estes West employees to take meal and rest breaks. (*Id.*) It determines the content and form of paychecks and the timing of final paychecks upon termination. (*Id.*)

Since the acquisition, Estes Express laid off all but one former G.I. Trucking employee and there is currently one payroll employee in California, who reports directly to Estes Express management and has no authority to determine pay practices or to vary from policy and practices set by Estes Express. (*Id.*) Instead, the Payroll Manager and the Human Resources Department for Estes Express in Virginia have the exclusive responsibility for enforcing payroll policy and ensuring payroll obligations are met for Estes West employees. (*Id.*) Paychecks for Estes West employees are drafted by Estes Express.

(*Id.*) In the end, Estes West "has no ability to independently set policy, make payroll decisions, to vary from decisions and policy set by Estes Express or even to cut payroll checks for California employees." (*Id.*)

Moreover, Estes West's employee policies are controlled by Estes Express, such as the content of Estes West's employee handbook and selection of benefits and the administration of benefit plans. (*Id.* ¶ 4.) Estes Express decides all benefit plan amendments, elimination of benefits, and the nature and scope of benefits, such as vacation, sick leave, and holiday pay. (*Id.*) The Estes West job descriptions are set by Estes Express, and when layoffs at Estes West were necessary, Estes Express decided all selection criteria, selected the positions to be eliminated, and set all severance benefits. (*Id.*) Although Estes West has no independent human resources or benefits department, it has a "regional human resources manager" who reports to Estes Express's Director of Human Resources. (*Id.*) And while "Estes Express possesses and maintains complete control over every significant term of employment for every Estes employee in the State of California," local managers of Estes West "give day to day instructions to employees, but such instructions are given strictly within the operating rules and guidelines established by" Estes Express. (*Id.*)

Defendants claim that Estes West could not satisfy a judgment obtained by Plaintiff and the proposed classes. Estes West maintains a bank account in California for payroll purposes as required by California law, which is funded by weekly deposits from Estes Express.[2] (*Id.* ¶ 5.) Estes

---

**2.** The Court notes that Ms. Gerczak's declaration takes care to subtly obscure the formal corporate distinction between Estes Express and Estes West, sometimes referring to only "Estes" (*see, e.g.,* 2d Gerczak Decl. ¶ 5 (indicating that "Estes maintains a bank account in California")), and often referring to Estes

West employees as, for example, "Estes employee[s] in the State of California" (*see, e.g., id.* ¶ 4 (noting that Estes Express "possesses and maintains complete control over every significant term of employment for every Estes employee in the State of California.")).

West has no source of revenue, and all bills sent to customers come from Estes Express, while all money paid by customers goes directly to Estes Express, except for funds needed for Estes West's payroll account. (*Id.* ¶ 6.) Estes Express files a consolidated tax return that includes Estes West, so Estes West does not file its own. (*Id.*) Moreover, Estes West has no business plan, does not hold independent board meetings, and does not establish its own budget. (*Id.* ¶ 7.) It does, however, have its own Board of Directors, albeit comprised of Estes Express employees. (*Id.*) Nevertheless, Defendants claim that Estes Express "makes no effort to distinguish Estes West from Estes Express to the general public." (*Id.*)

Estes West does have one functioning officer: a Regional Vice President, although that position is on Estes Express's payroll and reports to various executives of Estes Express. (*Id.* ¶ 8.) That officer cannot set policy or make company-wide decisions without approval of Estes Express. (*Id.*)

Defendants filed a notice of removal on March 26, 2010, claiming that the case met the requirements for diversity jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) and § 1446. Plaintiff has moved to remand the case, arguing that Defendants have failed to establish the required minimum amount in controversy, and, even if they did, the "Local Controversy" exception to CAFA removal jurisdiction applies.

## LEGAL STANDARD

█ Defendants removed this case pursuant to 28 U.S.C. § 1441, invoking the Court's jurisdiction under CAFA. Generally, removal statutes are strictly construed against removal jurisdiction. *Gaus v.*

Even so, Defendants never disavow Estes West's formal legal identity as a subsidiary of

*Miles, Inc.,* 980 F.2d 564, 566 (9th Cir. 1992). "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Id.*

█ CAFA altered preexisting rules for federal diversity jurisdiction over state-law class actions, providing now that federal courts may exercise jurisdiction when the "matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," and when "any member of a class of plaintiffs is a citizen of a State different from any defendant." § 1332(d)(2). As before CAFA, "the burden of establishing removal jurisdiction remains ... on the proponent of federal jurisdiction." *Abrego Abrego v. Dow Chem. Co.,* 443 F.3d 676, 685 (9th Cir. 2006). CAFA provides exceptions to jurisdiction, *see* § 1332(d)(4)(A), (B), however, and once the removing party meets the burden to establish CAFA jurisdiction, the non-removing party invoking an exception bears the burden to prove its application. *See Serrano v. 180 Connect, Inc.,* 478 F.3d 1018, 1024 (9th Cir.2007).

## DISCUSSION

The parties do not dispute that Plaintiff's class is larger than 100 and that the parties are minimally diverse as required by § 1332(d)(2). Thus, only two issues are presented by Plaintiff's motion: whether Defendants have demonstrated that Plaintiff is seeking more than $5,000,000; and, if so, whether Plaintiff has demonstrated that the Local Controversy exception nevertheless defeats jurisdiction under CAFA. Although Defendants prevail on the former issue, Plaintiff has demonstrated that the Local Controversy exception applies, and the Court must therefore remand this case to state court.

Estes Express.

**1148**

### A. Amount in Controversy

■■ Although "the plaintiff is 'master of her complaint' and can plead to avoid federal jurisdiction," *Lowdermilk v. U.S. Bank National Ass'n*, 479 F.3d 994, 998–99 (9th Cir.2007), the parties agree that Plaintiff has not alleged a specific amount of damages to avoid CAFA jurisdiction. "Where the complaint does not specify the amount of damages sought, the removing defendant must prove by a preponderance of the evidence that the amount in controversy requirement has been met." *Abrego*, 443 F.3d at 683. Therefore, a removing defendant must show " 'that it is *"more likely than not"* that the amount in controversy exceeds' " $5,000,000.00. *Muniz v. Pilot Travel Centers LLC*, No. S–07–0325 FCD EFB, 2007 WL 1302504, at *2, 2007 U.S. Dist. LEXIS 31515, at *7 (E.D.Cal. April 30, 2007) (emphasis in original). The burden is not "daunting," and "a removing defendant is *not* obligated to 'research, state, and prove the plaintiff's claims for damages.' " *Id.* (emphasis in original). But the defendant cannot speculate; it must "set forth the underlying facts supporting its assertion that the amount in controversy exceeds the statutory minimum." *Korn v. Polo Ralph Lauren Corp.*, 536 F.Supp.2d 1199, 1205 (E.D.Cal.2008). In deciding the amount in controversy, the Court looks to what the plaintiff has alleged, not what the defendants will owe, but the Court may also consider summary-judgment type evidence to assess the amount in controversy. *Id.*

■ Defendants have offered evidence that Plaintiff's aggregate alleged damages far exceed $5,000,000. First, Defendants calculated the possible penalties for Plaintiff's sixth cause of action, the non-compliant wage statements, at $2,276,000. That calculation was based upon research of employee records and computer databases to determine that 569 employees in the class worked for the entire 12–month period prior to the filing of the complaint.[3] (1st Gerczak Decl. ¶¶ 8–9.) The maximum possible penalty for non-compliant wage statements is $4,000 under California Labor Code section 226(e). Therefore, the maximum penalty multiplied by the class members ($4,000 × 569) amounts to damages totaling $2,276,000.

Next, Defendants calculated $705,739.37 in damages for Plaintiff's fourth cause of action for waiting-time penalties under California Labor Code section 203, which are capped at thirty days of wages. Defendants limited their calculations to claims of P & D Drivers like Plaintiff whose employment ended during the three-year period prior to the filing of the complaint. Gerczak determined the number of P & D drivers whose employment ended in each relevant year (57 in 2007, 51 in 2008, and 40 in 2009). (1st Gerczak Decl. ¶ 11.) Gerczak then calculated the average hourly rate for P & D Drivers as $21.61 and the average number of hours worked per day in each year (7.49 hours/day in 2007, 7.57 hours/day in 2008, and 6.89 hours/day in 2009). (*Id.*) That resulted in the following calculations:

2007: $21.61/hr × 7.49 hrs/day × 57 class members × 30 days = $276,778.71

2008: $21.61/hr × 7.57 hrs/day × 51 class members × 30 days = $250,289.18

2009: $21.61/hr × 6.89 hrs/day × 40 class members × 30 days = $178,671.48

Thus, Defendants calculated a total of $705,739.37 in damages for Plaintiff's waiting-time penalties claim. (*Id.*)

Finally, Defendants calculated $11,967,618 in damages for the second and third causes of action for missed meal and rest periods. Pursuant to the applicable

---

**3.** Defendants' calculation of the number of class members was conservative since they did not include employees who were not employed for the full twelve months.

Industrial Welfare Commission (IWC) Wage Order and California Labor Code § 226.7(b), each class member is entitled to recover one hour of pay for each work day that the meal period was not provided and also one hour of pay for each work day that the rest period was not provided. Defendants assumed one missed meal period and one missed rest period per day per P & D Driver in the class over the course of four years, 2006–2009 and again used the average hourly rate of $21.61 for P & D Drivers. (1st Gerczak Decl. ¶ 12.) Defendants determined the number of P & D drivers employed for each year (264 in 2006, 266 in 2007, 264 in 2008, and 271 in 2009) and calculated the following penalties for missed meal periods:

> 2006: $21.61/hr × 5 days/wk × 52 weeks/yr × 264 drivers = $1,483,310.40
> 2007: $21.6l/hr × 5 days/wk × 52 weeks/yr × 266 drivers = $1,494,547.60
> 2008: $21.6l/hr × 5 days/wk × 52 weeks/yr × 264 drivers = $1,483,310.40
> 2009: $21.61/hr × 5 days/wk × 52 weeks/yr × 271 drivers = $1,522,640.60

The yearly amounts were then added to determine a total violation of $5,983,809. (*Id.*) Since the calculation was identical for rest period violations, that amount was doubled, for a total of $11,967,618 in alleged penalties for the meal and rest period claims. (*Id.*)

Thus, for these claims alone, Defendants calculate that Plaintiff has put at least $14,949,357.37 in controversy ($2,276,000 for non-compliant wage statements + $705,739.37 for waiting time violations + $11,967,618 for missed meal and rest periods), well above the $5,000,000 requirement. And these calculations do not account for Plaintiff's claim for unpaid overtime, for Plaintiff's claim under Business and Professions Code section 17200, for any additional penalties under California Labor Code section 2699, or for attorney's fees.

Plaintiff does not quibble with Defendants' math, but claims that the calculations rest on two flawed assumptions. First, Plaintiff argues that Defendants cannot meet their burden of proof by assuming a 100% violation rate. However, courts have assumed a 100% violation rate in calculating the amount in controversy when the complaint does not allege a more precise calculation. *See, e.g., Korn,* 536 F.Supp.2d at 1205 ("Where a statutory maximum is specified, courts may consider the maximum statutory penalty available in determining whether the jurisdictional amount in controversy requirement is met."); *Alvarez v. Ltd. Express, LLC,* No. 07CV1051 IEG (NLS), 2007 WL 2317125, at *3–4, 2007 U.S. Dist. LEXIS 58148, at *8–9 (S.D.Cal. Aug. 8, 2007); *Muniz,* 2007 WL 1302504, at *3–4, 2007 U.S. Dist. LEXIS 31515, at *10–11. For example, in *Alvarez,* the plaintiff broadly alleged meal and rest period violations based on an " 'extreme workload' that made it 'virtually impossible' for defendant's employees to take meal periods and rest breaks" and a " 'company culture' that discouraged meal periods and rest breaks." 2007 WL 2317125, at *3–4, 2007 U.S. Dist. LEXIS 58148, at *9. Assuming the allegations in the complaint were true, the court concluded that the plaintiff's complaint could support a 100% violation rate. *Id.*

Similarly, in *Muniz,* the plaintiff did not allege "facts specific to the circumstances of her or the class members['] allegedly missed meal and/or rest periods"; "[i]nstead, plaintiff allege[d] a common course of conduct in violation of the law resulting in injury to herself and every other hourly employee employed by defendant in the State of California in the four years preceding the filing of the Complaint." 2007 WL 1302504 at *3–4, 2007 U.S. Dist. LEXIS 31515 at *11–12. The court permitted the defendant to use a 100% violation rate to determine the maximum penalties, since

the plaintiff was the "'master of [her] claim[s],' and if she wanted to avoid removal, she could have alleged facts specific to her claims which would narrow the scope of the putative class or the damages sought." *Id.* at *4, 2007 U.S. Dist. LEXIS 31515 at 13.

As in both *Muniz* and *Alvarez,* Plaintiff only broadly alleges his wage-and-hour violations. For example, he alleges that class members "consistently worked in excess of eight (8) hours in a day, in excess of twelve (12) hours in a day, and/or in excess of forty (40) hours in a week" (FAC ¶ 43); that class members "were required to work for periods longer than five (5) hours without an uninterrupted meal period of not less than thirty (30) minutes" (*id.* ¶ 53) and for "periods longer than ten (10) hours without a second uninterrupted meal period of not less than thirty (30) minutes" (*id.* ¶ 56); that class members were required to "work four (4) or more hours without ... a ten (10) minute rest period per each four (4) hour period worked" (*id.* ¶ 66); and that, "Defendants willfully failed to pay Plaintiff and class members who are no longer employed by Defendants their wages, earned and unpaid, either at the time of discharge, or within seventy-two (72) hours of their leaving Defendants' employ" (*id.* ¶ 74). Plaintiff included no limitation on the number of violations, and, taking his complaint as true, Defendants could properly calculate the amount in controversy based on a 100% violation rate.[4]

Plaintiff further argues that limiting the average hourly rate to the high-paid P & D Drivers improperly inflated the average; had Defendants included lower-paid hourly dockworkers and clerical staff, some of whom apparently earn minimum wage, the average would have been lower. (Reply 2.) In other words, according to Plaintiff, P & D Drivers make up only 46% of the class and the average hourly rate of $21.61 for P & D Drivers was far higher than the average wage would have been, had Defendants accounted for the other 54% of class members who made lower hourly rates.

Plaintiff is correct that it is "preferable for defendants to calculate the average hourly wage based on the average wage of all class members." *Helm v. Alderwoods Group, Inc.,* No. C 08–01184 SI, 2008 WL 2002511, at *4 n. 3 (N.D.Cal. May 7, 2008). However, even taking Plaintiff's argument to the extreme and assuming that the appropriate average hourly rate is California's minimum wage of $8.00/hour, *see* Cal. Labor Code § 1182.13, Plaintiff's position does not defeat jurisdiction.[5]

First, because the Court has concluded that a 100% violation rate is appropriate, Defendants have already established at least $2,276,000 is in controversy for Plaintiff's claim for non-compliant wage statements, and that calculation did not depend on an average hourly rate for the class.

---

**4.** To the extent *Lowdermilk* suggests a different result, it is distinguishable. There, the Court rejected the defendant's argument that the plaintiff's allegation that she was owed "up to 30 days" of penalty wages required the amount in controversy to be calculated assuming a 100% violation rate. *Lowdermilk,* 479 F.3d at 1001. That conclusion was reached after the court reviewed the defendant's evidence under the "legal certainty" standard applicable only when the plaintiff alleges specific damages below the statutory minimum, which was a "high bar," according to the court. *Id.* at 1000. Under the lesser preponderance of evidence standard applicable to this case, which was the same standard applied in both *Alvarez* and *Muniz,* the Court may appropriately assume a 100% violation rate.

**5.** Of course, this is a purely hypothetical scenario used for Plaintiff's benefit, since the class-wide average must be higher, considering that nearly half of the class consisted of P & D Drivers earning an average of $21.61/hour.

As a result, Defendants need only establish that the meal break, rest break, and waiting time penalties put an additional $2,742,000 in controversy to meet the CAFA jurisdictional minimum. Second, the Court will assume at least 569 members are in the class, which Plaintiff appears to accept as accurate for members who worked a full year and even asks the Court to "assume this is the average size of the class each year." (Reply 3.) At the assumed minimum hourly rate of $8.00, the alleged meal and rest period violations alone equal $9,468,160, far above the remaining $2,742,000 (or even the full $5,000,000) needed to satisfy the amount in controversy.[6] And waiting time penalties must be added, which are $261,264, again assuming the minimum wage of $8.00 per hour.[7] Thus, Plaintiff's argument that Defendants overstated the average hourly rate does not defeat the amount in controversy.

Finally, even if there was some doubt about the precision of Defendants' calculations, Defendants also did not account for any overtime violations, other penalties, or attorney's fees, which may be considered in calculating the amount in controversy. *See Lowdermilk,* 479 F.3d at 1000. Thus, the Court is satisfied that Defendants have demonstrated by a preponderance of evidence an amount in controversy greater than $5,000,000.

## B. Local Controversy Exception

■ Plaintiff argues that, even if the amount in controversy is satisfied, this case must be remanded based on CAFA's "Local Controversy" exception. As previously noted, Plaintiff bears the burden to demonstrate an exception under CAFA defeats federal jurisdiction. *See Serrano,* 478 F.3d at 1024. As relevant here, CAFA provides the Court "shall decline to exercise jurisdiction under paragraph (2)—

(A)(i) over a class action in which—

(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

(II) at least 1 defendant is a defendant—

(aa) from whom significant relief is sought by members of the plaintiff class;

(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

(cc) who is a citizen of the State in which the action was originally filed; and

(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

(ii) during the 3–year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons[.]

---

**6.** That number is reached through the following formula, multiplied by the four years at issue: $8.00/hr × 5 days/wk × 52 weeks/yr × 569 drivers = $1,183,520. This number must then be doubled to account for both a meal period and rest period violation each day.

**7.** The $261,264 is calculated based on the following formulas:

2007: $8.00/hour × 7.49/average hrs. worked per day × 30 days × 57 class members = $102,463.20
2008: $8.00/hour × 7.57/average hrs. worked per day × 30 days × 51 class members = $92,656.80
2009: $8.00/hour × 6.89/average hrs. worked per day × 30 days × 40 class members = $66,144.00

§ 1332(d)(4)(A). The local controversy exception is " 'narrow' " and " 'a federal court should bear in mind that the purpose of each of these criteria is to identify a truly local controversy—a controversy that uniquely affects a particular locality to the exclusion of all others.' " *Evans v. Walter Indus.*, 449 F.3d 1159, 1163–64 (11th Cir. 2006) (quoting legislative history).

There is no dispute that, for the purposes of the local controversy exception, more than two-thirds of Plaintiff's class are citizens of California, that the principal injuries occurred in California, and that Defendants have not been sued in a wage-and-hour class action in the previous three-year period. There is also no dispute that Estes Express is a citizen of Virginia (and not California) for diversity purposes. The parties' dispute centers on the exception's second requirement: whether Estes West can be considered a "citizen of the State in which the action was originally filed," i.e., California, and whether Estes West is a defendant "from whom significant relief is sought" and "whose alleged conduct forms a significant basis for the claims asserted" by the class.[8]

### 1. *Citizenship Requirement*

Because Estes Express is undisputedly a citizen of Virginia, in order for the local controversy exception to apply, Estes West must be a citizen of California. Although Plaintiff does not allege Estes West's citizenship specifically, Defendants do not deny that it is a citizen of California: they identify Estes West as a "wholly-owned subsidiary of Estes Express" that operates in California and Plaintiff has produced a registration for G.I. Trucking as a California corporation. Therefore, the Court does not doubt that Estes West

is a citizen of California for CAFA purposes.

To defeat the citizenship requirement in the Local Controversy exception, Defendants argue that Estes West's corporate citizenship must be disregarded because it is merely an alter ego of its parent, Estes Express. Because Estes Express is a citizen of Virginia, imputing its citizenship to Estes West would render Estes West non-local and would alone defeat the Local Controversy exception. In support of this claim and as discussed in detail *supra*, Defendants have presented evidence to demonstrate that Estes Express exercises significant control over the operations of Estes West.

■ However persuasive their factual showing is, Defendants' argument must fail as a matter of both law and equity. Normally, " 'in a suit involving a subsidiary corporation, the court looks to the state of incorporation and principal place of business of the subsidiary, and not its parent.' " *Danjaq, S.A. v. Pathe Commc'ns Corp.*, 979 F.2d 772, 775 (9th Cir.1992). This rule stems from the "general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).

■ "The only recognized exception to this rule"—invoked by Defendants here— "is where the subsidiary is the alter ego of the parent corporation," which permits the court to "view the formal separateness between the two corporations as merely a legal fiction." *Danjaq*, 979 F.2d at 775. Yet, the exception has no application

---

**8.** The Court rejects Defendants' request that the Court deny outright Plaintiff's invocation of the Local Controversy exception because Plaintiff did not initially address these re-quirements. Plaintiff addressed these issues both in his reply brief and in his supplemental briefing.

where, as here, a defendant seeks to disregard its corporate structure for its own benefit. *See Disenos Artisticos E Industriales, S.A. v. Costco Wholesale Corp.,* 97 F.3d 377, 380 (9th Cir.1996); *United Continental Tuna Corp. v. United States,* 550 F.2d 569, 573 (9th Cir.1977). "Generally, the corporate veil can be pierced only by an adversary of the corporation, not by the corporation itself for its own benefit" because "a corporation is not entitled to establish and use its affiliates' separate legal existence for some purposes, yet have their separate corporate existence disregarded for its own benefit against third parties." *Disenos,* 97 F.3d at 380. This is the familiar sword/shield analogy: "[A]lter ego is used to prevent a corporation from using its statutory separate corporate form as a shield from liability only where to recognize its corporate status would defeat the rights and equities of third parties; it is not a doctrine that allows the persons who actually control the corporation to disregard the corporate form." *Communist Party v. 522 Valencia, Inc.,* 35 Cal. App.4th 980, 994, 41 Cal.Rptr.2d 618 (Ct. App.1995).

■ In this case, Defendants maintained Estes West as a separate legal entity in California after acquiring G.I. Trucking, and continued conducting business in California under that formal structure. Regardless of Estes Express's control of Estes West, Defendants cannot now cast aside their chosen corporate structure in order to gain a significant jurisdictional benefit: the right to defend themselves in federal court against purely state-law wage and hour claims brought by a solely California class of employees. Even though Estes Express has not otherwise taken advantage of Estes West's separate corporate structure to seek to dismiss the class claims in this case, the rule is not so limited. Having done business as separate entities, Defendants " 'must assume the burdens thereof as well as the privileges.' "

*Communist Party,* 35 Cal.App.4th at 994, 41 Cal.Rptr.2d 618. Because " '[t]he alter ego doctrine is applied to avoid inequitable results[,] not to eliminate the consequences of corporate operations,' " *id.,* the Court finds that Estes West must be treated as a citizen of California and the citizenship requirement for the Local Controversy exception is satisfied.

### 2. *Defendant from Whom Significant Relief Is Sought by Members of the Plaintiff Class*

■ The Local Controversy exception further requires that the instate defendant be one "from whom significant relief is sought by members of the plaintiff class." § 1332(d)(4)(A)(i)(II)(aa). Defendants claim this requirement cannot be met because its evidence demonstrates that any relief obtained by Plaintiff would come from Estes Express, not Estes West, since Estes West has no source of revenue and no funds to satisfy a judgment. (2d Gerczak Decl. ¶ 5.) In contrast, Plaintiff argues that the class has pled all claims against both Defendants equally, so that under CAFA Estes West is, in fact, an in-state defendant "from whom significant relief is sought by members of the plaintiff class," and Estes West's ability to pay any judgment at some later date is irrelevant. A conflict exists in the case law on whether the ability of the local defendant to pay a judgment may be considered under this requirement, and the parties submitted supplemental briefing on the issue.

The Eleventh Circuit has stated that "significant relief" is sought against a local defendant if the "relief sought against that defendant is a significant portion of the entire relief sought by the class." *Evans,* 449 F.3d at 1167 (citing *Robinson v. Cheetah Transp.,* No. 06–0005, 2006 WL 468820, at *3–4, 2006 U.S. Dist. LEXIS 10129, at *12 (W.D.La. Feb. 27, 2006);

*Kearns v. Ford Motor Company,* No. CV 05–5644 GAF (JTLx), 2005 WL 3967998, at \*10, 2005 U.S. Dist. LEXIS 41614, at \*35 (C.D.Cal. Nov. 21, 2005)). However, some courts have taken this requirement to mean that a court should conduct "a comparison of the relief sought between all defendants and *each defendant's ability to pay a potential judgment.*" *Robinson,* 2006 WL 468820, at \*3–4, 2006 U.S. Dist. LEXIS 10129, at \*12 (emphasis added). As those courts reason, "[i]f the relief sought from a particular defendant is 'just small change' compared to the relief sought from the other defendants, then the particular defendant cannot be considered significant." *Green v. SuperShuttle Int'l, Inc.,* No. 09–2129 ADM/JJG, 2010 WL 419964, at \*3, 2010 U.S. Dist. LEXIS 7456, at \*10 (D.Minn. Jan. 29, 2010) (quoting *Robinson,* 2006 WL 468820, at \*3–4, 2006 U.S. Dist. LEXIS 10129, at \*12).

*Robinson* was the first decision to suggest that a local defendant's actual ability to pay could be relevant under the Local Controversy exception. In that case, the entirely in-state class sued an in-state individual truck driver, his out-of-state corporate employer, and other out-of-state corporate defendants for injuries sustained from an accident. 2006 WL 468820, at \*2, 2006 U.S. Dist. LEXIS 10129, at \*6. Relying on a Senate Judiciary Committee Report on CAFA, the court concluded that the in-state driver was not a defendant from whom "significant relief" was sought because any relief sought against him was "just small change" compared to the out-of-state corporate defendants. *Id.* at \*3–4, 2006 U.S. Dist. LEXIS 10129 at \*12–13. The court's reasoning rested primarily on a products liability hypothetical situation in the Senate Report in which a class sued a manufacturer and local automobile dealers for defective automobiles; the Report stated that, " '[e]ven if the plaintiffs are truly seeking relief from the dealers, the relief is just small change compared to what they are seeking from the manufacturers.' " *Id.* at \*3–4, 2006 U.S. Dist. LEXIS 10129 at \*12 (quoting S. Rep. 109–14 at 41 (2005)). Based on this sentence, the court conducted "not only an assessment of how many members of the class were harmed by the defendant's actions, but also a comparison of the relief sought between all defendants and each defendant's ability to pay a potential judgment." *Id.*

The court in *Green* applied this comment to a case in which the alleged local subsidiary was insolvent and unable to satisfy any judgment. 2010 WL 419964, at \*3–4, 2010 U.S. Dist. LEXIS 7456, at \*9–11. In that case, the defendants offered evidence that the local subsidiary was not profitable and was almost entirely dependent on its out-of-state parent for its "continued viability." *Id.* at \*3, 2010 U.S. Dist. LEXIS 7456 at \*10. Based on this evidence, the court concluded that it was "unlikely" that the subsidiary "could satisfy a judgment rendered against it if Plaintiffs prevailed," and because the "lion's share of any putative judgment would likely be borne by" the parent, the plaintiffs were not seeking significant relief from the local defendant. *Id.*

The Tenth Circuit, in contrast, has squarely addressed and rejected consideration of a local defendant's ability to pay to determine whether "significant relief" is sought by the class. *Coffey v. Freeport McMoran Copper & Gold,* 581 F.3d 1240, 1245 (10th Cir.2009) (per curiam). In *Coffey,* the purely in-state class brought only state-law claims involving local environmental contamination, naming the in-state former owner of the polluting property, as well as several out-of-state corporate owners of the in-state defendant. *Id.* at 1241–43. The court held that the "significant relief" requirement had been satisfied because (1) all class members had claims

against the local defendant, rather than merely a subset of the class; (2) all class members were seeking to hold the local defendant jointly and severally liable for all of the class damages; and (3) it was reasonably likely that the local defendant would be held equally responsible for the class damages. *Id.* at 1244–45.

Citing *Robinson*, the defendants argued that the local defendant had no assets to satisfy any potential judgment, so its inability to pay a judgment demonstrated that significant relief was not sought against it. *Id.* at 1244. The court squarely rejected this contention based on the plain language of the statute. *Id.* at 1245. "The statutory language is unambiguous, and a 'defendant from whom significant relief is sought' does not mean a 'defendant from whom significant relief may be obtained.'" *Id.* "There is nothing in the language of the statute that indicates Congress intended district courts to wade into the factual swamp of assessing the financial viability of a defendant as part of this preliminary consideration, which is one of six issues for the court to consider when deciding whether the 'local controversy exception' is met." *Id.*[9]

Defendants urge the Court to reject *Coffey* and follow *Robinson* and *Green* to conclude that a local defendant's ability to pay is relevant to whether "significant relief is sought" by the class. The Court declines Defendants' invitation for two reasons. First, the Court agrees with *Coffey* that the statutory language unambiguously prohibits consideration of a local defendant's ability to pay any potential judgment. In arguing that the statute is ambiguous and resort to legislative history is necessary,[10] Defendants focus too narrowly on the isolated term "significant relief." The issue here is the meaning of the phrase "from whom significant relief is sought," and that language is clear: it refers to a defendant from whom relief is *sought*, not a "'defendant from whom significant relief may be obtained.'" *Id.* at 1245. Under the plain language of the statute, this case is indistinguishable from *Coffey*. As in *Coffey*, the entire class pleads all its claims against Estes West, seeks to hold Estes West jointly liable with Estes Express, and it appears reasonably likely that Estes West could be held liable for the class claims.

Even though Defendants offer evidence that Estes West could not satisfy a judgment, the Court declines to "wade into the factual swamp of assessing financial viability of a defendant as part of this preliminary consideration." *Id.*

Second, even assuming the statutory language were ambiguous and resort to CAFA's legislative history were necessary, the Court is not persuaded that Congress intended a different result, as the courts in *Robinson* and *Green* concluded. The Senate Judiciary Committee Report on which *Robinson*, *Green*, and later cases relied provided several applications of the Local Controversy exception, but never directly

---

**9.** At least two later district courts have cited *Coffey* with approval, including one in this Circuit. *See Lafalier v. Cinnabar Serv. Co.*, No. 10–CV–0005–CVE–TLW, 2010 WL 1486900, at *7, 2010 U.S. Dist. LEXIS 36215, at *25–26 (N.D. Okla. April 13, 2010) (citing *Coffey* and stating that "the defendant's ability to satisfy a judgment is irrelevant" to the "significant relief" inquiry); *Rotenberg v. Brain Research Labs LLC*, No. C–09–2914 SC, 2009 WL 2984722, at *3 n. 4, 2009 U.S. Dist. LEXIS 91335, at *10 n. 4 (N.D.Cal. Sept. 15,

2009) (relying on *Coffey* and noting that "the question is whether Plaintiff is seeking 'significant relief' from these Defendants, and not whether 'significant relief may be obtained'").

**10.** *See Abrego*, 443 F.3d at 683 ("[C]onsideration of legislative history is appropriate where statutory language is ambiguous. Ambiguity, however, is at least a necessary condition.").

discussed the ability of a local defendant to pay a judgment.[11] *See, e.g., Green*, 2010 WL 419964, at *3–4, 2010 U.S. Dist. LEXIS 7456, at *9–11; *Waters v. Advent Prod. Dev., Inc.*, No. 07 CV 2089 BTM (LSP), 2008 WL 7683231, at *5–6, 2008 U.S. Dist. LEXIS 50686, at *13–16 (S.D.Cal. June 26, 2008); *Casey v. Int'l Paper Co.*, No. 3:07 CV 421 RV/MD, 2008 U.S. Dist. LEXIS 1298, at *16–17 (N.D.Fl. Jan.7, 2008); *Eakins v. Pella Corp.*, 455 F.Supp.2d 450, 452–53 (E.D.N.C.2006); *Robinson*, 2006 WL 468820, at *3–4, 2006 U.S. Dist. LEXIS 10129, at *11–14; *Kearns*, 2005 WL 3967998, at *10–12, 2005 U.S. Dist. LEXIS 41614, at *33–38. The "small change" comment on which *Robinson* and *Green* relied appeared in the following products liability hypothetical:

A class action is brought in Florida against an out-of-state automobile manufacturer and a few in-state dealers, alleging that a certain vehicle model is unsafe because of an allegedly defective transmission. The vehicle model was sold in all fifty states but the class action is only brought on behalf of Floridians. This case would not fall within the Local Controversy Exception for two reasons. First, the automobile dealers are not defendants whose alleged conduct forms a significant basis of the claims or from whom significant relief is sought by the class. **Even if the plaintiffs are truly seeking relief from the dealers, that relief is just small change compared to what they are seeking from the manufacturer.** Moreover, the main allegation is that the vehicles were defective. In product liability cases, the conduct of a retailer such as an automobile dealer does not form a significant basis for the claims of the class members....

S.Rep. No. 109–14, at 41 (2005) (emphasis added); *see also Green*, 2010 WL 419964, at *3–4, 2010 U.S. Dist. LEXIS 7456, at *10–11; *Robinson*, 2006 WL 468820, at *4, 2006 U.S. Dist. LEXIS 10129, at *13.

The Report's comment belies an interpretation that a fact-based inquiry into a defendant's ability to pay is permissible. The passage uses the word "seeking" twice to describe the class's relief, calling for a comparison of the "small change" the plaintiffs are "seeking" from the local dealers and the significant relief they are "seeking" from the manufacturer. There is no hint that the local dealer's solvency is relevant to that question.

The Report does, however, include a hypothetical situation very close to the instant case:

A class action is brought in Florida state court against a Florida funeral home regarding alleged wrongdoing in burial practices. Nearly all the plaintiffs live in Florida (about 90 percent). The suit is brought against the cemetery, a Florida corporation, and an out-of-state parent company that was involved in supervising the cemetery. No other class action suits have been filed against the cemetery. This is precisely the type of case for which the Local Controversy Exception was developed. Although there is one out-of-state defendant (the parent company), the controversy is at its core a local one, and the Florida state court where it was brought has a strong interest in resolving the dispute. Thus, this case would remain in state court.

S.Rep. No. 109–14 at 41. As in this scenario, the class in this case is 100% instate, alleging purely state-law claims against a local defendant and its supervising parent, and California has a strong

---

11. Some courts have questioned the value of examining the Senate Report in interpreting CAFA, since the Report was issued ten days after CAFA was signed into law. *See, e.g., Caruso v. Allstate Ins. Co.*, 469 F.Supp.2d 364, 370 (E.D.La.2007).

interest in resolving the dispute. And, once again, there is no suggestion that the cemetery's ability to pay a judgment is relevant to the Local Controversy inquiry.

Thus, consistent with the plain language of the statute and *Coffey,* the Court finds that Estes West is a local defendant "from whom significant relief is sought by members of the plaintiff class." *See Coffey,* 581 F.3d at 1244–45.[12]

3. *Defendant Whose Alleged Conduct Forms a Significant Basis for the Claims Asserted by the Proposed Plaintiff Class*

The significant basis requirement is fulfilled "[i]f the local defendant's alleged conduct is a significant part of the alleged conduct of all the Defendants." *Kaufman v. Allstate New Jersey Ins. Co.,* 561 F.3d 144, 156 (3d Cir.2009). "The plain text of this provision relates the alleged conduct of the local defendant, on one hand, to all the claims asserted in the action, on the other" and "calls for comparing the local defendant's alleged conduct to the alleged conduct of all the Defendants." *Id.* at 155–56. Under this provision, "significant" means "important, notable," and "[t]he local defendant's alleged conduct must be an *important* ground for the asserted claims in view of the alleged conduct of all the Defendants." *Id.* at 157 (emphasis in original).

As with the "significant relief" requirement, the Court asked the parties to submit supplemental briefing on whether the Court may consider Defendants' actual conduct or is limited to the conduct alleged in the complaint to determine whether the local defendant's "alleged conduct formed a significant basis" of the class claims. Like the "significant relief" requirement, the case law is in tension on this question. *Compare Evans,* 449 F.3d at 1167 (consid-

ering evidence to determine whether local defendant's conduct formed a "significant basis" of property contamination claims) *with Kaufman,* 561 F.3d at 157 (stating that, consistent with the plain language of the statute, "the District Court's focus here must be on the alleged conduct") *and Anderson v. Hackett,* 646 F.Supp.2d 1041, 1048 (S.D.Ill.2009) (focusing solely on allegations in complaint because "the Court must determine if [the local defendant's] '*alleged* conduct forms a significant basis for the claims asserted by the proposed plaintiff class' " (emphasis in original)).

If the Court were to follow *Kaufman* and *Anderson* in this case and rely only on Defendants' alleged conduct, Estes West's alleged conduct would form a significant basis of the class claims. As already stated, the class pleads all claims against both Estes Express and Estes West jointly and alleges the two entities were acting as agents for and ratified the conduct of one another. (FAC ¶¶ 12–13.) Whether Estes West will ultimately be held liable is immaterial at this stage. *See Anderson,* 646 F.Supp.2d at 1048. Instead, "the allegations against [Estes West] would, if proven, establish a right to relief for most, if not all, of the proposed plaintiff class." *Id.* at 1049. "In other words, had Plaintiffs brought this action only against [Estes West], the classes proposed by Plaintiffs and the relief sought ... would remain almost unchanged." *Id.*

As Defendants point out, however, limiting this inquiry to the face of the complaint is in tension with the general rule that a court may consider extrinsic evidence submitted by a party implicating the Court's subject-matter jurisdiction. *See, e.g., Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir.1987). Of course, Con-

---

**12.** The Court need not consider Plaintiff's belated argument that the class can seek an injunctive remedy for improper wage statements under California Labor Code section 226(g) against only Estes West.

gress could have intended to change this rule in the context of CAFA by using the phrase "alleged conduct" in the statute, as opposed to "actual conduct," or simply "conduct." *See Anderson*, 646 F.Supp.2d at 1048.[13] The Court need not decide the question. Even considering Defendants' evidentiary submission, the Court finds that Estes West's conduct forms a "significant basis" of the class claims.

■ The court in *Kaufman* outlined several factors to consider in determining whether a local defendant's "alleged conduct" forms a "significant basis" of the class claims:

1) the relative importance of each of the claims to the action; 2) the nature of the claims and issues raised against the local defendant; 3) the nature of the claims and issues raised against all the [d]efendants; 4) the number of claims that rely on the local defendant's alleged conduct; 5) the number of claims asserted; 6) the identity of the [d]efendants; 7) whether the [d]efendants are related; 8) the number of members of the putative classes asserting claims that rely on the local defendant's alleged conduct; and 9) the approximate number of members in the putative class.

*Kaufman*, 561 F.3d at 157 n. 13. Again, most of these factors are satisfied by Plaintiff's complaint: all of the wage and hour claims are alleged against Defendants equally; Defendants are intimately related to one another as parent and subsidiary; and every member of the 569–member class pleads claims against Estes West.

■ Defendants offer evidence that Estes Express set nearly all of Estes West's personnel policies and practices. Yet, Defendants' own evidence suggests that Estes West had a role in enforcing those policies: it had a separate payroll analyst, a Regional Vice President, a human resources manager, and, critically, other managers who "give day to day instructions to employees." (2d Gerczak Decl. ¶¶ 4, 8.) Plaintiff does not limit his claims to the policies promulgated by Estes Express, and his claims could be reasonably interpreted to cover the lack of proper enforcement of those policies by Estes West's local "day to day" managers. (*See, e.g.,* FAC ¶ 57 (alleging only that "Defendants willfully required Plaintiff and class members to work during meal periods"), ¶ 67 (alleging only that "Defendants willfully required Plaintiff and class members to work during rest periods").) Thus, even considering Estes Express's evidentiary submission, Estes West's alleged conduct forms a "significant basis" for the claims alleged in the complaint.[14]

## CONCLUSION

While Defendants have demonstrated that more than $5,000,000 is in controversy under CAFA, Plaintiff has demonstrated that CAFA's Local Controversy exception applies in this case. Therefore, the Court must decline to exercise jurisdiction. *See Serrano*, 478 F.3d at 1022. Plaintiff's mo-

---

**13.** Even that point is not entirely clear. In the Senate Judiciary Committee Report, the Committee noted that it "understands that in assessing the various criteria established in all these new jurisdictional provisions, a federal court may have to engage in some fact-finding, not unlike what is necessitated by the existing jurisdictional statutes." S. Rep. 109–14 at 44.

**14.** The Court rejects Defendants' suggestion that, because Plaintiff has alleged his claims against both Estes Express and Estes West equally, he cannot show one Defendant's conduct was more significant than the other. *See Anderson*, 646 F.Supp.2d at 1048 (rejecting argument that out-of-state defendant's conduct was worse than local defendant to defeat "significant basis" requirement).

tion is GRANTED and this case is RE-MANDED to Los Angeles Superior Court.

**IT IS SO ORDERED.**